IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:07CV396-H

| | |
|---|---|
| STACY C. HARRELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   **MEMORANDUM AND ORDER** |
| CITY OF GASTONIA, TERRY | ) |
| L. SULT, individually and in his | ) |
| capacity as Chief of Police, and | ) |
| ED TURAS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**THIS MATTER** is before the Court on the "Defendants' Motion for Summary Judgment" (document #28) and "Memorandum of Law in Support . . ." (document #29), both filed December 1, 2008; and the "Plaintiff's Response . . ." (document #34) filed December 23, 2008. On January 7, 2009, the Defendants their "Reply ..." (document #35).

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and this motion is now ripe for determination.

Having fully considered the arguments, the record, and the applicable authority, the undersigned will <u>grant</u> the Defendants' Motion for Summary Judgment, as discussed below.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

This is an action seeking compensatory and punitive damages pursuant to 42 U.S.C. § 1983 and a state common law libel claim.

The Plaintiff, Stacy C. Harrell, is a former police officer with the Gastonia Police Department, who is now employed by the Pinetops Police Department in Pinetops, North Carolina.

The Defendant City of Gastonia is a municipal corporation of the State of North Carolina. Defendants Police Chief Terry L. Sult and Sergeant Ed Turas are sworn officers of the Gastonia Police Department.

Taking the facts in the light most favorable to the Plaintiff, he had been a member of the Rocky Mount, North Carolina Police Department for approximately four years when his fiancee accepted new employment and relocated to Gastonia. As a result, he sought employment with the Gastonia Police Department (the "Department"), and was hired in August 2006. When hired, he was cautioned that he was a "probationary employee" and therefore subject to "summary termination without recourse."

The factual nexus of the Plaintiff's federal and state law claims is his belief that in retaliation for the Plaintiff's unwillingness to commit civil rights violations in the course of his employment, Defendants Sult and Turas fabricated incidents of poor performance by the Plaintiff, which they reduced to writing and placed in his personnel file, and which became the basis for his termination. Notwithstanding the fact that he presently is employed as a police officer, the Plaintiff further contends that the allegedly false statements contained in his personnel file have prevented him from obtaining employment with any other law enforcement agency.

In his Complaint, the Plaintiff alleged that he had been ordered, but refused, to commit civil rights violations. The Plaintiff's deposition testimony and other evidence, however, even taken in the light most favorable to the Plaintiff, does not establish an issue of material fact as to whether he was ever ordered, or even asked, to violate a suspect's civil rights.

During the Plaintiff's training he was required to "ride with" Officer Jonus Hansen, an Officer with whom his superiors allegedly knew he would "clash." In his Complaint, the Plaintiff cited two incidents in which he disagreed with Officer Hansen's judgment and directives. First, the

Plaintiff identified an incident in which Officer Hansen instructed him to stop a vehicle "for loud music." The Plaintiff testified that after the suspect's vehicle had been stopped, the Officers removed the suspect from the vehicle, and, following a suspicious movement by the suspect, frisked him for weapons and temporarily detained him by placing him in handcuffs and putting him in the back of the police vehicle. Officer Hansen then asked the suspect for permission to search his vehicle, which was granted. The Plaintiff testified that at the time he believed that the consent offered by the suspect was invalid due to the fact that at the time he gave consent, he was handcuffed and in the back of a police vehicle.[1] The Plaintiff further testified, however, that although he then believed the search was unlawful, he was not asked to participate in the search and did not inform Officer Hansen of his reservations until after the search had been conducted.

The second reported incident involving Officer Hansen took place while the Officers were investigating a vehicle accident in a fast food restaurant's parking lot. The accident caused no damage to either vehicle, and the Plaintiff declined to issue a citation to the driver who had admitted fault. Although he alleged in his Complaint, that Officer Hansen "became visibly angry and demanded to know why [the Plaintiff] refused to charge the driver with assault with a deadly weapon," the Plaintiff testified only that after he chose not to issue any citations, Officer Hansen asked the Plaintiff what charges he could have filed against the responsible driver, including whether the Plaintiff believed he could have charged the driver with assault with a deadly weapon.

---

[1] The Plaintiff has not addressed this issue in his brief, impliedly conceding his mistaken understanding of this aspect of search and seizure law. Indeed, it is well settled that "[n]either the drawing of a gun by an arresting officer, nor the handcuffing of the accused establishes involuntariness in and of itself." United States v. Elie, 111 F.3d 1135, 1145-46 (4th Cir. 1997) (internal quotations omitted). Accord United States v. Strickland, 245 F.3d 368, 382-83 (4th Cir.), cert. denied, 534 U.S. 894 (2001); and United States v. Seni, 662 F.2d 277, 281 (4th Cir. 1981). In other words, consent given while detained based on reasonable suspicion, or while otherwise "in custody," may nevertheless be voluntary. United States v. Boone, 245 F.3d 352, 362-63 (4th Cir. 2001), citing Florida v. Royer, 460 U.S. 491, 502 (1983) (detention based on reasonable suspicion); and United States v. Watson, 423 U.S. 411, 424 (1976) (custody).

In his deposition, the Plaintiff identified a third incident in which he disagreed with his superiors' directives. The Plaintiff and other Officers had been sent to a suspect's house to serve a criminal summons. The Plaintiff testified that although he was ordered to go to the back of the house and to chase the suspect if he ran from the other Officers, he was unsure whether the issuance of the criminal summons would have given him the authority to chase the suspect and use physical force to apprehend him. However, the Plaintiff testified that the suspect did not run, so it did not become an issue.

The final so-called "civil rights incident" involved the Plaintiff's search of a suspect's vehicle, and subsequent search of the driver and three passengers, based solely on the smell of marijuana that the Plaintiff detected emanating from the vehicle. The Plaintiff testified that he conducted a warrantless search of the vehicle and the suspects believing he had probable cause to search, and that he filed his report accordingly. The Plaintiff further testified that after he filed his report, he received a telephone call from Defendant Turas, that the Plaintiff surreptitiously recorded.

The parties hotly dispute what was said during the subsequent conversation between the Plaintiff and Defendant Turas. The Plaintiff avers in his present affidavit that Defendant Turas ordered him to falsify the report, that is, to state that he had not "searched" the individuals based on a belief that he had probable cause but rather had conducted "pat down" frisks, as authorized by Terry v. Ohio, 392 U.S. 1, 30 (1968), because he had a reasonable suspicion that criminal activity was afoot and that the occupants of the car posed a risk to his safety. Defendant Turas maintains, to the contrary, that he never instructed the Plaintiff to falsify his report and instead only counseled the Plaintiff concerning what he believed would have been a more appropriate method of developing probable cause to support a warrant to search the passengers.

Although the record does not contain a transcript of the recording of the disputed telephone

4

conversation, the Plaintiff did submit a copy of the tape recording, transferred to a CD, as an exhibit to his brief. The Court has carefully reviewed the recording, which clearly supports the Defendants' version of events. At the outset, rather than being directed at the specific incident, the overall subject and context of Defendant Turas' call was to advise the Plaintiff in a general sense how to conduct traffic stops and searches, including counseling the Plaintiff that absent obtaining the subject's consent or a search warrant, he should not search the passengers. While Defendant Turas clearly was concerned that in the specific instance the Plaintiff did not have grounds to search the individuals, at no point did he instruct, or even suggest, that the Plaintiff should falsify his report. Although Defendant Turas did mention that a <u>Terry</u> frisk would have been permissible, the focus of his comments was what the Plaintiff could have done to develop probable cause for a search warrant or to obtain consent to search.

On April 10, 2007, approximately eight months after he was hired, the Plaintiff was suspended without pay and recommended for termination. The Plaintiff was advised that as a probationary employee he was not entitled to a hearing, although the reasons for his suspension and probable termination were provided in writing ("the Sult Memorandum"). Specifically, Defendant Sult advised the Plaintiff that it was "clear that [his] integrity is in question and that [he] demonstrated a repeated failure to follow the orders of [his] supervisors," citing four illustrative examples: (1) "ignoring and violating Defendant Turas'[] order not to pursue a speeding vehicle that was traveling at 104 miles per hour on Interstate 85 in Gastonia"; (2) "'question[ing] the legitimacy of Sergeant Turas' orders[] not to seize a large sum of money found in the possession of foreign nationals during a traffic stop"; (3) "harassing Police Attorney Stephanie Webster and . . . lying to her about a deadline imposed by Defendant Turas"; and (4) "failing to report damage to his assigned police vehicle and . . . being dishonest about his lack of knowledge regarding the cause of that damage." The Plaintiff agreed to resign in lieu of termination.

Although in his present affidavit the Plaintiff denies that his performance was in any way

unsatisfactory – concerning the illustrative examples noted above or otherwise – both his deposition and other undisputed evidence in the record confirm the truth of the essential facts of three of the four incidents noted in the Sult Memorandum.[2] Concerning the first incident, which occurred on January 12, 2007, the Plaintiff admitted in his deposition that he continued to travel at a speed greater than the speed limit despite having received an order from Defendant Turas to end his pursuit of the suspect vehicle, and that rather than complying with Defendant Turas' initial order, the Plaintiff radioed Defendant Turas asking permission to stop the speeding vehicle.

As to the third incident in the Sult Memorandum (following the searches based on the odor of marijuana), on approximately March 5, 2007, Defendant Turas ordered the Plaintiff to speak with Stephanie Webster, the attorney for the Gastonia Police Department, to discuss constitutional issues with her, specifically the law as it relates to search and seizure. Defendant Turas further instructed the Plaintiff to be prepared to discuss those issues at a training meeting. The parties agree that at the time the Plaintiff was ordered to contact Ms. Webster, no date had been set for that meeting.

The Plaintiff denies that he ever misled Ms. Webster, but it is undisputed that on March 12, 2007 Ms. Webster contacted Defendant Turas complaining that the Plaintiff had informed her that the Fourth Amendment search and seizure materials were due on that date in order to meet a deadline that Defendant Turas had imposed, a deadline that she could not meet without neglecting other duties

---

[2] The second incident listed in the Sult Memorandum occurred on February 27, 2007, when the Plaintiff conducted a vehicle stop of an automobile occupied by two "subjects of possible Arab descent." The subjects had $9,000 in cash in their possession. Both subjects claimed to be from the Wilmington, North Carolina area and to be traveling to Georgia on a "buying trip," although one of the men claimed to be buying cell phones, while the other man told the Plaintiff that the purpose of the trip was to buy jewelry. Other than the large amount of cash in their possession and their conflicting stories regarding the purpose of their trip to Georgia, however, there were no indicators that the subjects were engaged in illegal activity, that is, the National Crime Information Center came back with no hits on the subjects, a search of the vehicle by officers and a K-9 unit discovered no contraband, and an F.B.I. agent on duty at the Joint Terrorism Task Force hotline informed the officers that the subjects were not recorded terrorist suspects. The Defendants contend that nevertheless, the Plaintiff requested that he be permitted to seize the subjects' money, but was told by Defendant Turas to release both the subjects and their money, and that soon thereafter, the Plaintiff acting on his own initiative contacted Immigration and Customs Enforcement ("ICE") agents to complain about Defendant Turas' order to refrain from confiscating the $9,000.00 in cash. The Plaintiff denies that he intended to seize the cash, and contends that he obtained Defendant Turas' permission before contacting ICE.

6

with a higher priority, and also that the Plaintiff had called her at home. While the Plaintiff maintains that he called Ms. Webster at home only after failing to reach her at her office, it is further undisputed that Ms. Webster considered the Plaintiff's call to her home to have been inappropriate.

Finally concerning the Sult Memorandum, in his deposition the Plaintiff agreed that there was nothing false or misleading about Defendant Sult's description of the incident involving unreported damage to the Plaintiff's patrol vehicle. Moreover, and although in his present brief the Plaintiff speculates that the damage "possibly" occurred while the vehicle was in the Department's garage, in his deposition the Plaintiff admitted that the damage was excessive, that the driver of the vehicle immediately should have been aware of it, and that once he was assigned the vehicle, he was not aware of anyone else having driven it. Further, the Plaintiff admitted that he never informed his supervisor of the damage and that when questioned by Defendant Sult, he was unable to state when, where, or how the damage had occurred.

The Sult Memorandum was placed in the Plaintiff's personnel file. The Plaintiff alleges that the Defendants placed this "false information" in his file to stigmatize the Plaintiff and to prevent him from working again as a law enforcement officer, and that "Defendant Sult, Defendant Turas, and/or an unknown member of the Department has published to other police agencies a false rumor" about the Plaintiff. Concerning the latter allegation, however, the Plaintiff admitted in his deposition that he had no evidence that either Defendant Sult or Turas had started or repeated any rumors about him.

It is undisputed that the contents of the Plaintiff's personnel file have not been made available to the public generally and have been disclosed only once to a third party, the Rocky Mount Police Department ("RMPD"), but only after the Defendants were presented with a "Waiver and Release" prepared by RMPD and signed by the Plaintiff as part of his application for employment with that agency. In relevant part, the Waiver and Release states that the Plaintiff authorized:

> …any military organization, educational institutions, governmental agencies, banks and credit agencies, former and present employers, and individuals to furnish to the Human Resources Director, City of Rocky Mount, NC or her authorized agent, all

7

> available information regarding me, whether or not it is in their records. I hereby release them from civil or criminal liability whatsoever for issuing the same.

In his deposition, the Plaintiff testified that he had "no issue" with being required to sign the Waiver and Release. Ultimately, the Plaintiff was not hired by the RMPD, but at some point was hired by the Pinetops Police Department, a position he continues to hold.

On September 21, 2007, the Plaintiff filed his initial Complaint. On October 24, 2007, the Plaintiff filed his First Amended Complaint, alleging § 1983 due process and equal protection claims against the individual Defendants and a § 1983 municipal liability claim against the Defendant City, as well as state law claims for libel per se, blacklisting, and intentional infliction of emotional distress.

On March 24, 2008, the Defendants filed their Motion to Dismiss (document #15), which the undersigned granted in part and denied in part in a Memorandum and Order entered on May 20, 2008. See document #18. The Court granted the Defendants' Motion as to all of the Plaintiff's claims except the libel per se claim against all Defendants as to false statements contained in the Plaintiff's personnel file that were published within the Gastonia Police Department), and the punitive damages claim against the individual Defendants in their individual capacities. Id. at 18.

Concerning the Plaintiff's §1983 due process claim against the individual Defendants, his § 1983 municipal liability claim against the Defendant City, and the portion of his libel per se claim that arose from the allegedly false statements being published outside the Gastonia Police Department, the Plaintiff failed to allege a necessary element of those offenses (or in the case of the municipal liability claim, an element of the requisite underlying due process claim). Specifically, the Plaintiff alleged:

> neither that the Defendants have a practice of releasing personnel files to all inquiring employers nor that they release personnel files only to certain inquiring [potential] employers, and that he intends to apply to at least one of these... [n]or has the Plaintiff alleged that if a potential employer requested his personnel file that the Defendants would release it without his consent.

Document #18 at 9 (internal citation omitted) (emphasis added).

8

Recognizing that the case was then in its early stages and that discovery was not yet complete, the undersigned granted the Plaintiff's request to file a second Amended Complaint, stating:

> the Plaintiff [will be allowed] to amend his Complaint, if there is a good faith basis for such an amendment ... [and] will be allowed **sixty (60) days** from the date of this Order to amend his Complaint so that he may conduct initial discovery on this issue to determine whether a good faith basis for the amendment exists.

Id.

Although the record does not disclose what discovery, if any, the Plaintiff conducted in the interim, on July 11, 2008, the Plaintiff filed his "Second Amended Complaint," re-stating his §1983 due process and municipal liability claims and the portion of his libel per se claim which arose from external publication of the allegedly false statements contained in the Sult Memorandum. Specifically, the Second Amended Complaint alleged that:

> upon information and belief, the false information was placed in [Plaintiff's] file by [Defendant Sult] in order to stigmatize [the Plaintiff], with knowledge that such information would be seen by any law enforcement agency with which [the Plaintiff] might seek employment, and with intent that any law enforcement agency seeking to employ [the Plaintiff] would be falsely counseled not to hire him.

Document # 23 at 5. [3]

On October 9, 2008, the Defendant City held a "name clearing hearing" for the Plaintiff related to his resignation from the Gastonia Police Department and the contents of his personnel file. The hearing was conducted by James Palenick, City Manager for the City of Gastonia. Under the rules adopted by the City, the Plaintiff, who was represented by his counsel, was permitted to present

---

[3] The quoted paragraph replaced the following paragraph in the First Amended Complaint:

> The accounts contained within the April 10, 2007, disciplinary memorandum to Harrell are false and misleading statements of fact regarding Harrell's conduct in his profession as a law enforcement officer, and they tend to impugn Harrell in that profession and to cause damage to his personal and professional reputation, and have caused him damage, including but not limited to the loss of his job and his inability to obtain employment with another police agency.

9

evidence and testimony regarding any information that he felt was false or misleading in his personnel file.

The Plaintiff presented evidence and testimony concerning the four incidents noted in the Sult Memorandum. Additionally, both the Plaintiff and his counsel asked questions of Defendant Sult regarding each of these incidents.

Following his review of the evidence submitted at the hearing, Mr. Palenick determined that none of the statements contained in the Sult Memorandum should be stricken or revised, and advised the Plaintiff of his decision in a letter dated October 15, 2008.

On December 1, 2008, the Defendants filed their Motion for Summary Judgment which has been fully briefed and is, therefore, ripe for determination.

## II. DISCUSSION

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and. . . the moving party is entitled to a judgment as a matter of law." Accord Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences

therefrom in the light most favorable to the party opposing the motion. Id. at 255; see also Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083 (4th Cir. 1980). In addition, a reviewing court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Waste Management Holdings, Inc., v. Gilmore, 252 F.3d 316, 329 (4th Cir. 2001), citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-50 (2000). However, "the court should give credence to ... evidence supporting the moving party that is uncontradicted and unimpeached." Reeves, 530 U.S. at 149-50. It also is well established in the Fourth Circuit that a plaintiff may not create an issue of fact by submitting an affidavit that is inconsistent with his prior deposition testimony. See Rohrbourgh v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990); and Wiley v. United Parcel Service, Inc., 102 F. Supp.2d 643, 653 (M.D.N.C. 1999).

Finally, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

### B. Section 1983 Claim

The Plaintiff alleges that the individual Defendants' actions "in disciplining and terminating the Plaintiff for pretextual reasons in retaliation for the Plaintiff's refusal to engage in unethical or illegal conduct, constitute the deprivation of the civil rights of the Plaintiff, including ... his right to the due process of law...." In other words, the Plaintiff alleges that by placing false information in his personnel file, the Defendants has denied him the opportunity to serve as a law enforcement officer, and that due process of law allows him to clear his name of false accusations.

"Although . . . a probationary employee[] has no protected 'property' interest in his employment . . ., a public employer cannot deprive a probationary employee of his 'freedom to take advantage of other employment opportunities.'" Sciolino v. City of Newport News, Va., 480 F.3d

642, 645 (4th Cir. 2007) (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 573 (1972)). Accordingly, a Fourteenth Amendment "liberty interest is implicated by public announcement of reasons for an employee's discharge." Johnson v. Morris, 903 F.2d 996, 999 (4th Cir. 1990).

As explained by the Fourth Circuit, the Plaintiff's claim arises from the combination of two distinct rights protected by the Fourteenth Amendment: "(1) the liberty to engage in any of the common occupations of life . . .; and (2) the right to due process where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." Sciolino, 480 F.3d at 646 (internal citations and quotations omitted). To assert such a claim, a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) "were made 'public' by his employer"; (3) were "made in the course of a discharge or significant demotion"; and (4) were false. Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 n.5 (4th Cir. 1988) (internal citations omitted).

The Fourth Circuit recently clarified what a plaintiff objecting to information placed in his personnel file must prove in order to satisfy the element that the charges against him were made public by his employer:

> . . . an employee must allege (and ultimately prove) a likelihood that prospective employers (i.e., employers to whom he will apply) or the public at large will inspect the file.
>
> A plaintiff can meet this standard in two ways. First, the employee could allege (and ultimately prove) that his former employer has a practice of releasing personnel files to all inquiring employers. Second the employee could allege that although his former employer releases personnel files only to certain inquiring employers, that he intends to apply to at least one of these employers.

Sciolino, 480 F.3d at 650. [4]

---

[4] Applying this standard, the Fourth Circuit affirmed the District Court's dismissal of the complaint, reasoning that the plaintiff "alleged only that his file with the charges 'may be available to prospective employers,'" but reversed the District Court's denial of the plaintiff's motion to amend his complaint to allege that his former employer had a practice of disseminating former employees' personnel files to local and regional police departments, "specifically including, and by way of example, the police departments of the cities of Suffolk and Hampton." Id. at 650-51.

12

Applying these legal principles to the facts in this case taken in the light most favorable to the Plaintiff, he has failed to raise an issue of material fact, as he earlier failed to allege, that the supposedly false statements placed in his personnel file have ever been "made public" by the Defendants. Indeed, rather than prove that the Defendants release personnel files to all inquiring employers, or to employers with whom the Plaintiff intended to apply – as in Sciolino, where the former employer had a practice of distributing personnel files to all other law enforcement agencies in the region – or otherwise of releasing his personnel file without his consent, the undisputed facts are that the Plaintiff's personnel file has been disclosed only once, to the Rocky Mount Police Department. This disclosure was made only after the Defendants received a "Waiver and Release" prepared not by the Defendants, but by the RMPD, and executed by the Plaintiff.

In short, taking the evidence in the light most favorable to the Plaintiff, the Defendants have released his personnel file only when he requested that they release it. Accordingly, the Plaintiff has again failed to satisfy the "made public" element of his § 1983 claim against the individual Defendants, and their Motion for Summary Judgment as to that claim must and will be granted.

The Plaintiff has also failed to establish an issue of material fact as to the falsity of three of the four incidents that were noted in the Sult Memorandum, which stated that the Plaintiff was being recommended for termination for (1) "ignoring and violating Defendant Turas'[] order not to pursue a speeding vehicle that was traveling at 104 miles per hour on Interstate 85 in Gastonia"; (2) "'question[ing] the legitimacy of Sergeant Turas' orders[] not to seize a large sum of money found in the possession of foreign nationals during a traffic stop"; (3) "harassing Police Attorney Stephanie Webster and . . . lying to her about a deadline imposed by Defendant Turas"; and (4) "failing to report damage to his assigned police vehicle and . . . being dishonest about his lack of knowledge regarding the cause of that damage."

As discussed in Section I above, the Plaintiff admitted in his deposition that he disobeyed Defendant Turas' order to break off his pursuit of the speeding vehicle. The Plaintiff further

admitted that Defendant Sult's Memorandum was not misleading concerning the fourth incident because he, in fact, did not report and could not account for the damage to his police vehicle, although he admitted the damage should have been discovered "immediately" by the driver. Although the Plaintiff disputed whether he harassed Ms. Webster over the phone or told her falsely that there was a deadline for her research to be complete, it is undisputed that Ms. Webster reported exactly those facts to Defendant Turas. In other words, concerning the third incident, Defendant Sult's Memorandum was also accurate.

### C. Section 1983 Claim Against the City of Gastonia

As the undersigned has previously held concerning the Defendants' Motion to Dismiss, a local government entity "is responsible under § 1983 ... [only] when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Accordingly, because the Plaintiff has failed to establish an issue of material fact as to his underlying § 1983 due process claim, that is, he has failed to establish a constitutional injury, his § 1983 municipal liability claim must fail as well and the Defendants' Motion for Summary Judgment will be granted as to that claim.

### D. Libel Claim

When pleading a libel per se claim, "a plaintiff must allege that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." Boyce & Isley, PLLC v. Cooper, 153 N.C. App. 25, 29, 568 S.E.2d 893, 897 (2002) (citation omitted). The North Carolina Court of Appeals has held in the context of a libel claim that placing information in a personnel file does not amount to publication of that information, even if the information is passively available for others to read. See Pressley v. Continental Can Co., 39 N.C. App. 467, 468, 250 S.E.2d 676, 677 (1979).

14

The Plaintiff maintains that the statements in the Sult Memorandum have impugned his reputation, were published within and without the Gastonia Police Department, and have severely limited or eliminated his ability to obtain employment with another law enforcement agency. The Plaintiff further alleges that the Defendants acted with actual malice in making the allegedly libelous statements.

At the outset, and as discussed above concerning the Plaintiff's § 1983 claims, the Plaintiff has raised an issue of material fact as to the falsity of only one of the four incidents described in the Sult Memorandum, that is, that he improperly attempted to seize $9,000 in cash from the suspects of "Arab descent," and that he then improperly complained to an ICE Special Agent about Defendant Turas' refusal to allow seizure of the money. However, for the same reasons discussed above concerning his § 1983 claims, the Plaintiff has failed to show that any of those statements were "published" to a third party. Indeed, other than the Defendants releasing the contents of the Plaintiff's personnel file to the RMPD <u>at the Plaintiff's request</u>, the Plaintiff admitted in his deposition that he has no evidence that any of the Defendants had published the contents of his personnel file to <u>any</u> other party.

For these reasons, the Defendants' Motion for Summary Judgment shall be <u>granted</u> as to the Plaintiff's libel <u>per se</u> claim, both as to statements allegedly published within and without the Gastonia Police Department.

Finally, and assuming <u>arguendo</u> that the Plaintiff had raised an issue of material fact as to the publication of the Sult Memorandum, his libel claim would nevertheless be barred by the public official immunity doctrine. "The law of public official's immunity is well established in North Carolina: As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability." <u>Thompson v. Town of Dallas</u>, 142 N.C.App. 651, 655, 543 S.E.2d 901, 904 (2001) (citations omitted). "Our courts recognize police officers as

15

public officials. Thus, police officers enjoy absolute immunity from personal liability for their discretionary acts done without corruption or malice." Schlossberg v. Goins, 141 N.C.App. 436, 446, 540 S.E.2d 49, 56 (2000). "It is well settled that absent evidence to the contrary, it will always be presumed that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law." Leete v. County of Warren, 341 N.C. 116, 119, 462 S.E.2d 476, 478 (1995). Accord Maines v. City of Greensboro, 300 N.C. 126, 132, 265 S.E.2d 155, 159 (1980). "This presumption places a heavy burden on the party challenging the validity of public officials' actions to overcome this presumption by competent and substantial evidence." Leete, 341 N.C. at 119, 462 S.E.2d at 478.

Even taking the facts in the light most favorable to the Plaintiff, he has failed to establish an issue of material fact as to whether the Defendants acted with malice towards him. Although the Plaintiff complained generally that he was terminated and that damaging statements were placed in his personnel file in retaliation for his refusal to commit civil rights violations, his testimony and other undisputed evidence, including the recording of a conversation between the Plaintiff and Defendant Turas, contain no evidence of malicious behavior by the Defendants.

As discussed above, the first supposed "civil rights incident" involved nothing more than the Plaintiff's mistaken belief that a suspect who was handcuffed and seated in the backseat of a police car could never give lawful consent to a search of his vehicle. Moreover, the Plaintiff further testified that although he then believed the search was unlawful, he was not asked to participate in the search and did not inform Officer Hansen of his reservations until after the search was conducted.

The second reported incident, also involving Officer Hansen, took place while the Officers were investigating a vehicle accident in a fast food restaurant's parking lot. Contrary to his earlier allegations in his Complaint, the Plaintiff testified that after he decided not to issue a citation to the driver who had admitted fault, rather than becoming angry or demanding that the Plaintiff charge the

driver with assault with a deadly weapon, Officer Hansen simply <u>asked</u> the Plaintiff what charges he <u>could</u> have filed against the responsible driver.

Similarly, the third incident involved, at most, a disagreement between the Plaintiff and other Officers as to whether the issuance of a criminal summons gave them the authority to chase a suspect and use physical force to apprehend him. The Plaintiff testified that in any event, the suspect did not flee so it did not become an issue.

The final alleged "civil rights incident" involved the Plaintiff's search of a suspect's vehicle, and subsequent search of the driver and three passengers, based on the smell of marijuana that the Plaintiff detected emanating from the vehicle. The Plaintiff testified that he believed he was permitted to carry out a warrantless search of the vehicle, the driver, and the other passengers, and that he filed his report accordingly. However, as discussed above, although the Plaintiff later accused Defendant Turas of ordering him to falsify his report, the recording clearly supports the Defendants' version of events, that is, rather than being directed at the specific incident, the overall subject and context of Defendant Turas' call was to advise the Plaintiff in a general sense how to conduct traffic stops and searches, including counseling the Plaintiff that absent the subject's consent or issuance of a search warrant, he should not search the passengers. While Defendant Turas clearly was concerned that in the specific instance the Plaintiff did not have grounds to search the individuals, at no point did he instruct, or even suggest, that the Plaintiff should falsify his report.

### III. ORDER

**NOW, THEREFORE, IT IS ORDERED:**

1. The "Defendants' Motion for Summary Judgment" (document #28) is **GRANTED,** and the Second Amended Complaint is **DISMISSED WITH PREJUDICE.**

4. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED AND DECREED.**

Signed: January 29, 2009

_____
Carl Horn, III
United States Magistrate Judge